# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1880
Filed February 11, 2026

———————————

**In the Interest of C.R., Minor Child,**

**J.B., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Dallas County,
The Honorable Erica Crisp, Judge.

———————————

**AFFIRMED**

———————————

Ryan Gravett, West Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, attorneys for appellee State.

Jeremy Evans, Des Moines, attorney and guardian ad litem for minor child.

———————————

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

A mother appeals the termination of her parental rights to C.R. (born 2018).[1] The mother argues that the State did not prove the statutory grounds for termination under Iowa Code section 232.116(1)(f) (2025) and that termination was not in the child's best interests. The mother made progress in this case by participating in therapy, however she continued to associate with her paramour who had committed domestic violence against her. The mother's continued association with the paramour remained a concern throughout this case. On appeal, the State argues that the mother had not sufficiently addressed her trauma, she continued to allow the paramour to be part of her life, and the child's mental health was negatively impacted because of witnessing violence between the paramour and mother.

Upon our review, we agree that the child could not be returned to the mother at the time of the termination hearing and it was in the child's best interests to terminate the mother's parental rights, so we affirm the termination of parental rights.

## I. Background Facts and Proceedings.

Most recently, the family came to the attention of the Iowa Department of Health and Human Services (HHS) in August 2022, when the child's older sibling became involved with the juvenile court due to a delinquency action. The older sibling had allegedly threatened to burn down the family home with the mother and the child inside and threatened a neighbor with a knife. Law enforcement was called to the home to respond

---

[1] The juvenile court also terminated the father's parental rights but he does not appeal. The child also has an older sibling, who is not the subject of this appeal, so when we refer to "the child" we mean C.R.

to crises multiple times until ultimately the mother requested the older sibling be removed from the home. The removal of the older sibling occurred in August 2023, and the child remained placed with the mother. In October, the child and older sibling were adjudicated children in need of assistance (CINA) so that services could be offered to address the mother's failure to exercise a reasonable degree of care in supervising her child under Iowa Code 232.96A(3)(b).

As the case progressed, other issues were discovered. For over a decade, the mother has had a tumultuous relationship with her paramour. The mother testified that her paramour began to physically abuse her in the first two years of the relationship and the physical abuse has continued ever since, evolving into both emotional and financial abuse as well. The paramour is the responsible party for founded or confirmed reports of child abuse against the child and the older sibling dating back to 2018. The allegations include physical abuse, denial of critical care, and exposure to dangerous substances.

In one occurrence, the paramour physically assaulted the mother while the older sibling and child were in the home. After this assault, the paramour was convicted of two counts of domestic abuse assault by strangulation with bodily injury, domestic abuse assault second offense, and two counts of child endangerment and was sentenced to a term in prison not to exceed five years. There was a five-year no-contact order (NCO) put in place beginning in May 2021 between the paramour and the mother; the older sibling was included as well. The paramour served approximately two years of his sentence. After his release, the mother established contact with him prior to the NCO being removed.

In December 2023, the mother reported that she wanted to have the NCO removed. The mother had the NCO modified and dropped in January 2024, but not as to contact between the older child and paramour. Yet, she allowed her paramour to move into the family home without first consulting HHS. After learning of this, the HHS social worker required the mother to sign a safety plan focused on keeping the paramour out of the family home and away from the child, but the mother did not adhere to it and the paramour continued to contact the child. When the guardian ad litem (GAL) visited the child in early February, the child told the GAL that she had seen the paramour and the mother said not to tell anyone at HHS.

Additional concerns with the family were that the child missed eight out of thirty-two days of school, the mother had tested positive for marijuana in January, and the mother failed to submit to both a substance-use or mental-health evaluation. In light of these concerns, HHS petitioned for temporary removal of the child from the mother's custody. The juvenile court granted the removal and the child was placed in the custody of HHS "for purposes of family foster care."

Shortly after the child was placed outside of the home, the mother began to have supervised two-hour visits twice a week with the child. The Family-Centered Services (FCS) reports stated that the mother began attending the recommended services of substance-use counseling and mental-health counseling. The April report from FCS stated that the mother could identify that domestic violence had occurred but "she was not able to see where the children would be in danger if [the paramour] were around." The mother failed to understand why the paramour could not attend visits with the child and did not think that the paramour was "a dangerous person."

The paramour and mother reported that on April 9 their relationship ended and the paramour moved out. The paramour claimed it was his choice, and he felt it was for the best for the mother's relationship with the child. The HHS report after this still noted the relationship as a concern because in the past the mother had agreed to no longer see the paramour but still did. The mother had a "history of appearing to choose men and diminishing the concern for the children's safety."

During the June reporting period from FCS, the mother progressed to semi-supervised visits with the child. But the mother's therapy was disrupted due to her new full-time employment. In addition to maintaining her own therapy appointments, HHS wanted the mother to be involved in the child's therapy and treatment.

In July, the paramour arrived at an appointment for the child with food for the child and the mother. After the FCS worker informed them that the paramour needed to leave, the mother threatened that if the paramour had to leave then she would be leaving too. The FCS worker pointed out that the child needed the mother present at that time, but the mother stated what the child needed "was to be home" as she disagreed with the child being at the appointment. Both the mother and paramour left before the child's appointment was concluded.

When the child's therapist asked if the child had been seeing the paramour on visits, the child replied yes but that the mother told her to tell others he was not there. This concerned the child's therapist as it put the child in a "situation where she has to lie and keep secrets." The mother claimed that the paramour had only shown up during one semi-supervised visit and he left when the mother asked him to because the child was there.

After the event where the paramour showed up to the child's appointment, the mother returned to fully supervised visits with the child. Other concerns were that the mother slept though several visits or arrived late to visits. Also, the mother stopped attending therapy.

In August, the child was moved to a placement approximately ninety miles away from the mother's home. The child was then placed with fictive kin and, less than a month later, the child was again placed in a family foster home due to the fictive kin's medical issues. While the child was placed with the fictive kin, the mother did not utilize all possible opportunities to meet with the child even when gas assistance was provided to the mother.

In January 2025, the mother committed theft with her paramour, but she reiterated that they were not in a relationship.

In February, the mother was granted an additional six months to work toward reunification. The mother was given specific conditions to meet prior to the child returning to her custody, including "demonstrat[ing] the ability to maintain a safe, stable living environment free of violence, substances and illegal activities."

In April, the older sibling returned to the mother's custody. Concerns remained that the mother was still interacting with the paramour, even though the NCO was still in effect between the paramour and the older sibling. At some visits with the child held at the mother's home, FCS workers were not allowed in a room in which the mother was overheard having a conversation. She claimed she was speaking to herself or the cat. In May, the mother's paramour was found to be living in the home. The paramour was subsequently arrested for violating the NCO and pled guilty to the charges. The paramour listed the mother's address as his home address

when applying for counsel for the NCO violation. HHS removed the older sibling from the mother's custody. The same month the State filed a petition to terminate the mother's parental rights to the child.

A termination trial occurred in September. The mother testified about her progress in therapy. She began therapy with a new provider less than three months before the trial. Additionally, the mother testified she had talked to the paramour shortly before the trial. This interaction turned sour and the mother "hit a cigarette out of his mouth." The paramour then filed for an NCO against the mother and she was served with it a few days prior to the termination trial. At the trial, the HHS social work case manager testified that it would be in the child's best interests for the mother's rights to be terminated.

After the trial, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f). The mother appeals.

## II. Standard of Review.

We review termination of parental rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Our primary concern is the child's best interests. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

"We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116." *D.W.*, 791 N.W.2d at 706. "Evidence is clear and convincing when there are no serious or substantial doubts as to the

correctness or conclusions of law drawn from the evidence." *Id.* (cleaned up).

### III. Analysis.

On appeal the mother argues that the State did not meet their burden of proof under Iowa Code section 232.115(1)(f) and that the termination was not in the best interests of the child. We address each of her arguments in turn.

**A. Statutory Framework.** The juvenile court terminated the mother's rights under Iowa Code section 232.116(1)(f). That section allows for termination when: (1) the child is four years of age or older, (2) the child has been adjudicated CINA, (3) the child has been removed from the physical custody of the parent for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days, and (4) there is clear and convincing evidence that the child cannot be returned to the custody of the parent at the present time. Iowa Code § 232.116(1)(f); *see also In re R.M.-V.*, 13 N.W.3d 620, 626 (Iowa Ct. App. 2024) (defining "at the present time" to mean "at the time of the termination hearing" (citation omitted)). Under Iowa Code section 232.102, a child cannot be returned to the parent if the child would be exposed to any harm amounting to a new CINA adjudication. *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (noting that a "threat of probable harm will justify termination").

The mother only challenges the fourth element. She argues that the State failed to prove by clear and convincing evidence that the child could not be returned to her custody at the time of the termination hearing.

As noted by the court appointed special advocate for the child, domestic violence was the "main factor" in this case. The mother had an inability to end the ongoing relationship with her paramour and provide a safe home for the child. During the nineteen months that the child was removed from the home, the mother could not end the decade-long relationship with the paramour. Throughout this case the mother participated in varying levels of therapy but has had the most success with her recent therapist. The mother only began seeing this therapist less than three months before the termination hearing. During therapy she claims to have begun to address her trauma and patterns of domestic violence. Testimony at the termination hearing revealed there were improvements made by the mother over the weeks leading up to the hearing. Still, a few weeks before the hearing the mother interacted with the paramour which resulted in him obtaining an NCO against her. She testified at the termination trial that she was in the process of filing sexual assault charges against him as well. Thus, the juvenile court could not be assured the toxic relationship had ended as of the termination trial date.

We commend the mother for her recent progress made in therapy, but the improvements made are too little too late. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (finding that "changes in the two or three months before the termination hearing, in light of the preceding eighteen months, [were] insufficient"). As described by the HHS social worker, the mother "displayed problematic decision making" when she allowed her paramour to have contact with the family prior to the NCO being removed and allowed him to move into the family home without first contacting HHS. She even instructed the child not to tell anyone about having contact with the paramour. Instead, the mother allowed the paramour to have contact with the child in violation of the HHS safety plan.

Additionally, when the older sibling returned home, the mother allowed the paramour in the home despite the existing NCO between the paramour and the older sibling. This resulted in HHS again removing the older sibling from the mother's custody. The mother had progressed from fully supervised to semi-supervised visits with the child but after the paramour was found to be at the mother's home again her visits regressed back to fully supervised. The mother never progressed beyond fully supervised visits after that point. *See In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024) (finding failure to progress beyond fully supervised visits "prevented an immediate return of custody").

In considering any progress made by the mother the GAL remained concerned about the mother's lack of "accountability for the role she has played in her children's struggles and their removals has made it difficult to impossible to make progress in the matter." The GAL opined that the mother's efforts were "superficial in nature" and that she lacked a "recognition of the issues that have brought us before the court." Throughout the case the mother could not show a genuine commitment to creating a safe home for the child. *See In re S.O.*, 483 N.W.2d 602, 603 (Iowa 1992) (finding that if the child was placed in the mother's custody the child would be "in imminent risk of harm" due to the mother's "pattern of sporadic cohabitation and visitation" with the abusive father and the mother's "failure to protect the children from abuse"), *superseded on other grounds as recognized in*, *In re L.T.*, 924 N.W.2d 521 (Iowa 2019).

For these reasons, we find the evidence supports termination of the mother's parental rights under section 232.116(1)(f).

**B. Best Interests.** "Even after we have determined that statutory grounds for termination exist, we must still determine whether termination

is in the children's best interests." *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The mother argues that termination is not in the child's best interests because of "the positive reports from family therapy, it can only be assumed that suddenly ending such a positive service and the progress made will have negative consequences on [the child's] mental health." But we read the reports from the child's therapist as contending that the child needs stability and permanency. The child's therapist reported that permanency will assist the child in "gain[ing] a sense of security and safety in order to begin to engage further in healing from . . . trauma." The child has met the criteria for post-traumatic stress disorder and has voiced her fear of the paramour. And the school professionals involved with the child emphasized that the ongoing improvement with the child's behaviors and educational progress would require stability going forward which was happening with the pre-adoptive foster family. *See In re L.H.*, 904 N.W.2d 145, 153 (Iowa 2017) (noting that a child raised in a "violent home[] may also experience impaired social competence and even post-traumatic stress disorder" (citation omitted)).

A parent's past performance can offer a preview of the future care that the parent might provide. *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). At the time of the termination hearing, the child had been removed for nineteen months. In that time the mother failed to fully utilize services and recognize the impact of domestic violence so that the child could safely be returned to her custody. Throughout this case the mother has been

repeatedly untruthful about her relationship with the paramour and unable to set proper boundaries. Although the older child had trauma issues related to the paramour as well, the mother allowed the paramour to reenter the family home despite the NCO between him and the older sibling.

After the State has proven a ground for termination under Iowa Code section 232.116(1), we cannot deprive the child of permanency by hoping that the mother will someday "learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010). We find that the termination of the mother's rights is in the child's best interest.

### IV. Conclusion.

We conclude the State proved the statutory grounds for termination under Iowa Code section 232.116(1)(f) by clear and convincing evidence and that termination of the mother's rights was in the child's best interests. Upon our de novo review, we affirm.

**AFFIRMED.**